UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                  )
CÉSAR SANTANA,                    )
                                  )
                Petitioner,       )
                                  )
        v.                        )        CIVIL ACTION
                                  )        NO. 18-11761-WGY
BRAD COWEN,                       )
Superintendent, MCI Norfolk,      )
                                  )
                Respondent.       )
_____)


YOUNG, D.J.                              February 14, 2019

**MEMORANDUM AND ORDER**

## I.   INTRODUCTION

   César Santana ("Santana") petitions this Court for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254.  Pet. Writ Habeas

Corpus ("Pet."), ECF No. 1.  Brad Cowen ("Cowen"),

Superintendent of Massachusetts Correctional Institution ("MCI")

Norfolk, opposes Santana's petition for habeas relief.  Resp't's

Mem. Law Opp'n Pet. Writ Habeas Corpus ("Opp'n Mem."), ECF No.

18.

   In his petition, Santana insists that the Massachusetts

Supreme Judicial Court, based upon the evidence before it,

unreasonably determined that he voluntarily made incriminating

statements to police officers.  Pet. 6; Mem. Points &

Authorities Supp. Pet. Writ Habeas Corpus ("Pet. Mem.") 8-13,

ECF No. 2.  Santana further asserts that the Supreme Judicial
Court unreasonably applied clearly established federal law in
ruling that he voluntarily gave incriminating statements to the
police.  Pet. 6; Pet. Mem. 13-18 (citing U.S. Const. amends. V,
XIV).  Santana argues that the Supreme Judicial Court erred when
it determined that because the police provided him with <u>Miranda</u>
warnings, after assuring him that his incriminating statements
would be confidential, his statements were voluntary.  Pet. Mem.
13-16.  Santana also suggests that the Supreme Judicial Court
failed to weigh the police officer's promise to put in a good
word for him with state officials.  <u>Id.</u> at 16-18.  Santana thus
maintains that the Massachusetts Superior Court erred when it
refused to suppress his incriminating statements and that the
Supreme Judicial Court erred when it did not overturn the
Superior Court's decision.  <u>Id.</u> at 8-18.  Therefore, Santana
asks this Court to grant his petition for habeas corpus and
order his release or a new trial.  <u>Id.</u> at 20.

Cowen, in response, counters that the Supreme Judicial
Court rightfully, from both a factual and legal standpoint,
refused to overturn the trial court's denial of Santana's motion
to suppress.  Opp'n Mem. 9-17.  Thus, Cowen asks this Court to
deny Santana's request for relief.  <u>Id.</u> at 17.

After hearing argument from both parties, and careful consideration, this Court DENIES Santana's petition for habeas relief.

## A.    Factual Background

On August 25, 2004, Rafael Castro ("Castro"), the victim, and his stepdaughter, Norma Cedeno ("Cedeno"), were entering Castro's apartment in Lawrence when four men attacked them. Commonwealth v. Santana, 477 Mass. 610, 611-12 (2017).  While Castro attempted to help Cedeno, one of the home invaders shot Castro.  Id. at 612.  The men moved Cedeno into a bedroom and placed a pillowcase over her head.  Id.  From there, Cedeno heard the men yelling and striking Castro, insisting that he place a phone call.  Id.  The men further threatened to burn Cedeno if Castro did not comply.  Id.  Subsequently, the men left the apartment, promising to return if Cedeno attempted to call the police.  Id.  After the men had left, Cedeno discovered Castro bound, unresponsive, and bleeding from a gunshot head wound.  Id.  Cedeno removed the duct tape restraining Castro and dialed 911.  Id.  When paramedics arrived, they determined that Castro had died.  Id.

During the criminal investigation, police recovered DNA that matched Santana's from the duct tape used during the home invasion.  Id. at 612-13.  Before the end of August 2004, Santana contacted his probation officer, who was monitoring

Santana due to another matter, and informed him that he was willing to disclose information about a Lawrence shooting for a fee. Id. at 613 & n.2. He told the probation officer that he knew that Joonel (Joonie) Garcia had shot an individual in the head and where the gun used in the murder was located. Id. at 612-13. The probation officer relayed the tip to the Boston Police Department. Id. at 613. Santana contacted his probation officer again in March 2005. Id. Santana, who was incarcerated at the time, told the probation officer that he had "significant legal concerns" and that the murder to which he had previously referred was "drug-related." Id.

State Police Trooper Robert LaBarge ("LaBarge") and Lawrence Police Detective Carlos Cueva ("Cueva") then interviewed Santana about Castro's murder. Id. Cueva, who grew up speaking both Spanish and English, but lacked formal Spanish translation training, acted as a translator during the interview. Id. at 613 & n.4. The portions of the interview at issue in this action are as follows:[1]

---

[1] Communications translated from Spanish are noted by asterisk. Words spoken in English, within an asterisked passage, are underlined. Spelling and grammatical errors, present in the original transcript, have been retained. See generally Pet. Mem., Ex. 2, Translated Tr. Police Question ("Police Tr."), ECF No. 4-2. Some non-substantive transcript notations have been omitted for the purposes of readability. See generally id.

LaBarge: [Santana] has said that he has consented to us audio taping our talk with him. [Santana], do you have any problems with us talking on the tape recorder?

Santana: [N]o, no problem, no

LaBarge: [O]kay, can you just, can you just translate that? Ask him, ask him --

*Cueva: (garbled) machine to record the -- what we're doing now. You don't have a problem with that?

*Santana: Okay, no problem . . .

LaBarge: Okay

*Santana: [A]s long as it is not used in court, better if not used in court

*Cueva: No, do not worry

*Santana: [T]hat whatever I say to you be confidential

LaBarge: [A]nd as I told you, you said your English is okay but somewhat --

Santana: Sometimes . . . I don't understand

LaBarge: [S]ometimes not so good, but how long have you've [sic] been in the United States?

Santana: [E]le . . . ten years.

LaBarge: [T]en years.

Santana: [Y]eah, . . . almo eleven

LaBarge: [Y]ou can understand me pretty much, but we've got [Cueva] here in case you run into any problems, right?

Santana: [A]hum.

. . .

LaBarge: [H]ow far did you get in school?

Santana: Eight grade

LaBarge: Eight grade where?

Santana: Puerto Rico

. . .

LaBarge: And can you read and write?

Santana: Spanish?

LaBarge: Spanish.

Santana: Yeah, perfect.

. . .

LaBarge: Uh, I'm going to have you read this form out loud, and just say number one, read it, and then tell me if you understand it or not. Okay?

*Santana: [D]o I have to read it like that . . .

*Cueva: [Y]es

*Santana: [F]or me or . . . ?

*Cueva: [N]o, for everyone

*Santana: [B]efore any question is asked, it is necessary that you understand your rights

*Cueva: Do you understand? After each line, he wants you to yes or no you understand that line, do you understand me? [sic]

*Santana: What?

*Cueva: [A]fter, re, to read, reading the first line he wants you that you say that yes or no, that you understand what [missing/wrong particle] say [sic].

*Santana: Okay. You have the right to remain silent

*Cueva: Do you understand that?

[6]

*<u>Santana</u>: [Y]es

<u>LaBarge</u>: Do you understand number one?

*<u>Santana</u>: <u>[Y]es</u>, anything you say can be employed
against you

<u>LaBarge</u>: Do you understand number two?

<u>Santana</u>: Yes.  That's, that's number three.

<u>LaBarge</u>: What's number two?  Did you understand
two, number two?

*<u>Santana</u>: <u>Yeah, -- number four is that</u> you have the
right to speak with an attorney so that he can advise
you before we ask you some question and to have with you
during the interrogation.  <u>Number five --</u>

<u>LaBarge</u>: Where is . . . number four, did you
understand it?

*<u>Santana</u>: <u>Yes.</u>  If you, if you don't have anything
with what [sic] to pay an attorney, one will be assigned
to you before the interrogation, if you want.

*<u>Cueva</u>: [D]o you understand that?

*<u>Santana</u>: Yes.  If you decide to answer some
questions -- now, with no attorney -- present -- however
you'll have the right to, to, cease the interrogation at
any moment until you can call an attorney.

<u>LaBarge</u>: What was that one?

<u>Cueva</u>: He said number five

<u>Santana</u>: Number six

<u>LaBarge</u>: Okay.

<u>Santana</u>: Yes.

<u>LaBarge</u>: Number seven.

*<u>Santana</u>: [D]o you understand what I have read to you?  Knowing all of these rights, do you want to speak with me now?  <u>Yes</u>

<u>LaBarge</u>: So what's number eight say in English? [C]an you translate that for me?  What's that mean?

<u>Santana</u>: I-c c-c-an't, I can't --

<u>LaBarge</u>: What's that mean?  What's that mean?

<u>Santana</u>: That If -- I - if I want to talk to you

<u>LaBarge</u>: Okay --

<u>Santana</u>: And I say yes

<u>LaBarge</u>: And you, yes, you will talk to . . .?

<u>Santana</u>: Yes.

<u>LaBarge</u>: Okay, I need you -- to sign the form, and do you have any questions about that form?

<u>Santana</u>: No.

<u>LaBarge</u>: No questions?

<u>Santana</u>: No.

<u>LaBarge</u>: You've been read this form before, right? you know what all this stuff mean [sic] and . . . I need you to put your signature there.  Sign there, and the time now is uh . . . sixteen thirty one, or four thirty one, and the date is four, or excuse me, March fourth two thousand five.  So, put, on the 'X', sign and then print your name.  Do you know what means 'print'?

*<u>Cueva</u>: [N]o, do not sign your name, write your name

*<u>Santana</u>: I put the name that I have here in the jail

<u>LaBarge</u>: [P]robably looks the same, right?

<u>Santana</u>: I put the nickname.

[8]

Cueva: He put the name that he was locked up with.

Santana: I'm sorry.

LaBarge: What's your real name?

Santana: Santiel Concepción Malpica

LaBarge: [W]ell sign it there.

Santana: [B]ut this, this is a . . .

LaBarge: [J]ust sign your real name.  If that's, that's fine -- What is it?  What's your real name?

Santana: Santiel Concepción Malpica

LaBarge: Ok, I'm witnessing it.  [Cueva] will witness it, aaand -- Tommy will witness.  Alright.

. . .

LaBarge: [A]nd I'm not going to make you any promises or any threats but what I will tell you is, is I will report to the District Attorney . . . Do you know what the District Attorney is?

*Cueva: [D]o you know who that [sic] is?

*Santana: [W]ho?

*Cueva: [T]he court attorney of [sic] for us

Santana: [N]o

LaBarge: [T]he prosecutor, the lawyer.

*Cueva: [T]he attorney that is going to be against you when you go to court

*Santana: [T]he one who's going to be with me or against me?

*Cueva: [A]gainst you, [wrong Spanish word], us, he's going to go with the information you tell me, if you help us --

[ 9 ]

*Santana: [C]an I ask him a question [on a different topic]?

. . .

LaBarge: [I]f, if you, if you help us out in this case I'm going to, I -- can't make any promises but I'll report to the District Attorney and tell him that you were cooperative and you helped us figure out what happened inside that apartment, and how it went down, and how, we're missing a few pieces to put it together, totally. It's like putting a puzzle together and we're missing some pieces, and I think you can help us put the puzzle together, and we're giving you a, we're, we're giving you an opportunity now to help us out, and uh, see how it goes, do you understand that?

*Cueva: Do you understand what he's saying?

LaBarge: Cuz you are the; you are the key. You are one of the keys.

*Santana: I understand that, but the problem is that I've been used, I've been used

. . .

LaBarge: I have to be, I have to be honest. We are going to use the information. We, that is our goal . . . and our goal, my goal, I have to be honest, my goal is not to, to save, to save you and to help you out. My goal is to find the truth. That's my goal, to find the truth, but at the same time I don't want to burn you. Do you understand what I'm saying? I don't want to burn you from the information you gave me but my goal, my goal isn't, isn't to help [Santana] out. My goal is to solve this out, solve this crime, and figure out what happened, but at the same time I can, I can bring up the fact that you were very cooperative and you were a, you played a big part in helping us figure out the little pieces that need to put together [sic]. . . . . You understand what I'm saying?

*Santana: What is he saying?

*Cueva: [H]e's saying that he's not here to promise you that if you tell me that I want to go I want to go

that we are doing to let you go, [sic] understand, that your case is going to come out well without problems, do you understand me? [sic] Any information that you give us now, he'd go to the court and they'd talk with the judge and the lawyer and to say that "look, [Santana] came, talked to me, gave me that and, we're going to try to help you, but he wouldn't give you er . . . er, you know -- [sic]

*Santana: Can I ask him a question? Then I'm going to, tell him that I'm going to cooperate with him one hundred percent on everything he wants. I have all the information that you need, all the pieces that you need for your puzzle I have it in my hands

LaBarge: What's he saying?

Cueva: He's saying that he's willing to help you out a hundred percent, all the pieces you're looking for in your puzzle, he, he's willing to give you those pieces.

LaBarge: Okay, and also I just got to, I just, I've got to let you know. You are the one who has to decide whether you, you, you think it's best for you, your, your goal is to take care of [Santana]. [Santana] is number one for you right?

*Santana: What?

*Cueva: [T]hat he's telling you that you want that you care for yourself. [sic] That's your first thing. That y-y-y . . . er . . . er you want to come out well from all of what's happening [sic]

*Santana: [O]f course, the problem is, I'm not worried for, I'm not worried for telling him and the police what I got to say, understand?, the thing is . . .

LaBarge: If you were, if you were --

*Santana: [T]he one up there, understand? that young nineteen-year-old guy, that little guy has about four deaths under his belt. That young guy has me, he has me, you know, he has me under a lot of pressure and terrified

Pet. Mem., Ex. 2, Translated Tr. Police Question ("Police Tr.")

1-12, 15-22, ECF No. 4-2; see Pet. Mem. 4-5.  Additionally, at

Santana's insistence, the officers turned off the recorder,

Police Tr. 23-28, and continued questioning Santana with LaBarge

writing down Santana's responses as Cueva translated, Pet. Mem.

5.  At the conclusion of the interview, however, Santana refused

to sign the document because "[h]e did not know where he stood

in the case" and "had concerns about Joonel Garcia, who had shot

several people, including Rafael Castro."  Pet. Mem. 5 (internal

citations and quotations omitted).

A court interpreter, Dr. Michael O'Laughlin ("O'Laughlin"),

evaluated Santana's proficiency in both English and Spanish.

Id. at 5 & n.4.  He found that Santana scored a two out of ten

on a Basic English Skills Test and had a seventh-grade Spanish

reading comprehension level.  Id. at 5.  O'Laughlin determined

from the interview recording that Cueva failed to provide

Santana with accurate translations of LaBarge's lengthier

questions, did not translate several of Santana's responses, and

asked side questions of Santana which LeBarge did not hear.  Id.

at 5-6.

### B.  Procedural History

On December 12, 2008, an Essex County grand jury indicted

Santana on six counts: "first degree murder (count 1), home

invasion (count 2), armed assault during a burglary (counts 3

and 4), and kidnapping while armed with a firearm (counts 5 and 6)." Pet. Mem. 1; see also Opp'n Mem. 3. On January 31, 2017, a jury found Santana guilty on all counts. Pet. Mem. 1-2. On February 12, 2014, Justice Lowy, then of the Massachusetts Superior Court, sentenced Santana to life in prison without parole.[2] Id.

During trial, Santana moved three times to have the statements he made in his police interview excluded or suppressed. Id. at 3. All of Santana's motions were denied. Id. The Supreme Judicial Court reviewed and affirmed the denial of his third motion to suppress, which raised the issue of whether his statements were made voluntarily. Santana, 477 Mass. at 614, 620. The Supreme Judicial Court's denial is the basis of his current petition. See Pet. Mem. 8.

The Supreme Judicial Court denied his appeal on August 17, 2017. Santana, 477 Mass. at 629. Santana is currently serving his sentence in state custody at MCI Norfolk. Pet. Mem. 2. He filed the present habeas petition with this Court on August 17,

---

[2] The sentences imposed on each count are as follows: "Count 1, life without parole; Counts 2 and 3, 35-60 years concurrent with Count 1; Count 4, 18-20 years concurrent with Count 3; Count 5, 9-10 years, concurrent with Count 1; Count 6, 9-10 years from and after Count 5. [Santana] was given 1889 days sentence credit." Pet. Mem. 2. When calculating this sentence, "[t]he felony convictions were not merged with the felony murder finding, because the court sentenced on the extreme atrocity and cruelty finding." Id. at 2 n.2.

2018.  Id. at 20; Pet. 16.  This Court heard argument on January

10, 2019 and took the matter under advisement.  Electronic

Clerk's Notes, ECF No. 20.

## II.  ANALYSIS

Santana argues that the police officers conducting his

interview told him that his statements would not be used against

him in court; and thus: 1) the Supreme Judicial Court's

determination that his statements were voluntary resulted from

its unreasonable determination of the facts, and 2) the Supreme

Judicial Court unreasonably applied federal law (specifically,

the Fifth and Fourteenth Amendments of the United States

Constitution) when it determined that his statements were

voluntary.  Pet. Mem. 8.  Santana further contends that these

constitutional errors had a prejudicial impact on the jury's

decision in his case.  Id. at 18-20.

### A.   Standard of Review

Santana submitted his application for habeas corpus

pursuant to section 2254 of chapter 28 of the United States

Code.  Id. at 2, 8, 13.  Section 2254(e) provides the standard

by which federal courts must evaluate a petitioner's challenge

of a state court's factual determinations:

> **(e)(1)** In a proceeding instituted by an application for
> a writ of habeas corpus by a person in custody pursuant
> to the judgment of a State court, a determination of a
> factual issue made by a State court shall be presumed to
> be correct.  <u>The applicant shall have the burden of</u>

[14]

> rebutting the presumption of correctness by clear and
> convincing evidence.

28 U.S.C. § 2254(e)(1) (emphasis added); see also Teti v.

Bender, 507 F.3d 50, 57 (1st Cir. 2007); Stewart v. DiPaolo, 74

F. App'x 65, 65 (1st Cir. 2003).  A "factual issue" may consist

of "basic, primary, or historical facts: facts in the sense of a

recital of external events and the credibility of their

narrators."  Coombs v. Maine, 202 F.3d 14, 18 (1st Cir. 2000)

(internal citations and quotations omitted).  The presumption of

correctness applies to factual determinations reached by state

trial and appellate courts alike.  Gaskins v. Duval, 640 F.3d

443, 452 (1st Cir. 2011).  To rebut this presumption, a

petitioner must assert something more than a mere "contrary

inference."  See Desrosier v. Bissonnette, 502 F.3d 38, 43 (1st

Cir. 2007).

In addition to establishing a presumption of correctness,

section 2254 provides guidance as to how federal courts ought

evaluate whether a state court's legal or factual determination

was so unreasonable that habeas relief must be granted:

> **(d)** An application for a writ of habeas corpus on behalf
> of a person in custody pursuant to the judgment of a
> State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim --
> > **(1)** resulted in a decision that was contrary to, or
> > involved an unreasonable application of, clearly
> > established Federal law, as determined by the
> > Supreme Court of the United States; or

> **(2)** resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Jordan v. Reilly, No. 06-1321, 2006 WL 3290953, at *3 (1st Cir. Nov. 14, 2006) (quoting 28 U.S.C. § 2254(d)(1)-(2)); Coombs, 202 F.3d at 18. Section 2254(d) applies both to "pure issues of law" as well as issues of law and fact where "legal principals are applied to historical facts." Coombs, 202 F.3d at 18. Federal courts must be "'highly deferential' to state court decisions." Correa v. Ryan, 216 F. Supp. 3d 193, 197 (D. Mass. 2016) (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2003)).

Under section 2254(d)(1), a decision is "contrary" where it conflicts with Supreme Court case law or diverges in holding from a factually similar Supreme Court decision. Gaskins, 640 F.3d at 451-52. A state court "unreasonably applies" federal law where it "applies Supreme Court precedent to the facts of [a] case in an objectively unreasonable manner such as reaching a result that is devoid of record support for its conclusion." Id. at 452 (internal citations and quotations omitted). For a decision to be "objectively unreasonable," a state court's mistake must "be more than incorrect or erroneous." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). "Clearly established federal law" refers specifically to "holdings, as opposed to the

dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. 652, 660-61 (2004) (quoting <u>Williams</u> v. <u>Taylor</u>, 529 U.S. 362, 412 (2000)).

A reviewing federal court must read section 2554(d)(2) in tandem with section 2254(e). <u>Sanna</u> v. <u>DiPaolo</u>, 265 F.3d 1, 7 (1st Cir. 2001). Specifically, this means that section 2254(e) should be used to evaluate "determinations of factual issues rather than decisions," and section 2254(d)(2) "'applies to the granting of habeas relief' itself." <u>Teti</u>, 507 F.3d at 57-58 (quoting <u>Miller-El</u> v. <u>Cockrell</u>, 537 U.S. 322, 341-42 (2003)) (noting that there is confusion amongst federal courts as to how sections 2254(d)(2) and 2254(e) interact, but ultimately electing to follow Supreme Court's direction in <u>Miller-El</u>); <u>see also</u> <u>Fletcher</u> v. <u>O'Brien</u>, Civ. No. 06-40280-FDS, 2011 WL 3295319, at *6-7 (D. Mass. July 29, 2011) (Saylor, J.). This means that:

> [U]nder this approach, section 2254(d)(2)'s reasonableness standard would apply to the final decision reached by the state court on a determinative factual question, while § 2254(e)(1)'s presumption of correctness would apply to the individual factfindings, which might underlie the state court's final decision or which might be determinative of new legal issues considered by the habeas court.

<u>Teti</u>, 507 F.3d at 58; <u>Fletcher</u>, 2011 WL 3295319, at *7.

Further, a determination is not "unreasonable" under this section merely because "'reasonable minds reviewing the record might disagree' about the finding in question." Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)); see also Akara v. Ryan, 270 F. Supp. 3d 423, 431 (D. Mass. 2017) (Hillman, J.); certificate of appealability denied, No. 17-1992 (1st Cir. Nov. 8, 2018). There instead must be clear and convincing evidence that the state court's decision is factually incorrect. Akara, 270 F. Supp. 3d at 431 (citing Miller-El, 537 U.S. at 340). Additionally, "facts" in this subsection are defined in the same manner as section 2254(e). Compare Sanna, 265 F.3d at 7 with Coombs, 202 F.3d at 18.

Finally, for a federal court to grant a petitioner's application for habeas corpus under section 2254, a federal court not only must hold that the state court committed constitutional error, but also find that the petitioner experienced "actual prejudice" as a result of the error. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Faulk v. Medeiros, 321 F. Supp. 3d 189, 195-97 (D. Mass. 2018). To determine whether actual prejudice exists, a court must decide "whether the error 'had substantial and injurious effect or influence in determining the jury verdict.'" Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946));

see also <u>Cronin</u> v. <u>Commissioner of Probation</u>, 783 F.3d 47, 51 (1st Cir. 2015); <u>Dominguez</u> v. <u>Duval</u>, 851 F. Supp. 2d 261, 269 (D. Mass. 2012).

### A. The Supreme Judicial Court's Decision Did Not Result from an Unreasonable Determination of the Facts in Light of the Evidence

Santana alleges that, based on the evidence in the record, the Supreme Judicial Court made three unreasonable determinations of fact. Pet. Mem. 9-13. The first error, Santana argues, is the court's determination that Santana could "speak and understand a fair amount of English" and "fully understood what was going on" in the interview. <u>Id.</u> at 9 (internal citations and quotations omitted). There was no evidence in the record to support this determination, Santana insists. <u>Id.</u> Santana asserts that the Supreme Judicial Court did not take into account expert testimony that he "spoke at a beginner's level of English and was only capable of conversing in English on a superficial level, such as a standard greeting, and spoke the beginner's level of English." <u>Id.</u> at 10. Based on Santana's inability fully to translate his <u>Miranda</u> rights into English when asked and his seeming confusion over the functions of the District Attorney, which LaBarge referenced during questioning, Santana argues that "[t]here can be no reasonable finding that [he] could 'obviously' understand what LaBarge was saying in English or 'fully understood what was

going on,'" despite the Supreme Judicial Court's contrary
determination.  Id. at 9-10.

The Supreme Judicial Court's second error, Santana argues,
was concluding that he understood that his statements could be
used by law enforcement against him based on the fact that he
subsequently requested to speak to the officers without being
recorded and declined to provide his signature for the officer's
interview notes.  Id. at 11 (citing Santana, 477 Mass. at 619).
Such a conclusion, Santana insists, was "unreasonable" when
taking into account the evidence in the record.  Id.  Santana
asserts that the real reason he asked the officers to turn off
the recording and did not provide his signature on their
interview notes was that he feared retaliation by Garcia, not
because he feared use of the information he provided in court.
Id.  Santana argues that his requests for confidentiality
mirrored the protocol he had as a confidential informant.  Id.

The Supreme Judicial Court's third error, Santana proffers,
was its determination that Santana spoke with law enforcement
based upon "self-interest" and fear of Garcia and that he was
not worried about talking to law enforcement.  Id. at 12.
Santana insists that just because a statement is made in self-
interest does not mean that it cannot also be involuntary.  Id.
Further, Santana argues that an interviewee can simultaneously
fear retaliation and the use of his statements in court.  Id.

The record, Santana claims, evidences that "he did not want his words to be used in court [and] specifically asked for (and received) assurances that they would not be so used." Id. Therefore, Santana contends that the Supreme Judicial Court violated his Fifth and Fourteenth Amendment rights when it included these factual determinations in its totality-of-the-circumstances analysis of whether his statement was voluntary. Id.

The Supreme Judicial Court's decision here did not result from an "unreasonable determination of the facts in light of the evidence presented." See 28 U.S.C. §§ 2254(d)(2)-(e). While Santana's argument regarding the "individual factfinding" of the second alleged error does give the Court pause, the Court's ultimate determination that his statement was voluntary was not "unreasonable." See 28 U.S.C. § 2254(d)(2); Teti, 507 F.3d at 58.

First, Santana did not rebut the factual determination that he understood "a fair amount of English" and "fully understood what was going on" in the interview with clear and convincing evidence. See Pet. Mem. 9. It is prudent here to first place these statements in their full context as they appear in the Supreme Judicial Court's opinion:

> Relying on the transcript of the recorded portion of the interview, the motion judge also found that the tone of the interview was "conversational," [Santana]

> was "relaxed throughout," and "appeared to be chuckling
> or laughing" on occasion. Regarding [Santana's]
> language skills, the [motion] judge found that [Santana]
> <u>"plainly can speak and understand a fair amount of
> English," although Spanish is "obviously" his "primary
> language."</u> The judge further found that "[Santana]
> plainly understood each [Miranda] right," provided to
> him in Spanish, and "at times [he] corrected LaBarge as
> to the numbering of these rights." Last, <u>the judge
> determined that although "Cueva's translation,
> obviously, could have been much better," [Santana]
> nevertheless "fully understood what was going on."</u>

<u>Santana</u>, 477 Mass. at 615-16 (emphasis added). To say that the

Supreme Judicial Court "cited approvingly" these statements, is

taking them somewhat out of context. <u>Compare</u> <u>id.</u> <u>with</u> Pet. Mem.

9.

Even assuming that the court did cite these determinations

approvingly, however, Santana has not rebutted the presumption

of their correctness. On the issue of whether Santana can speak

a "fair amount of English," despite Santana's assertion to the

contrary, the police transcript indicates that he could. Police

Tr. 3:2-3, 3:13-4:14, 5:27-6:48, 11:94-102, 17:139-40, 18:146-

47. The Supreme Judicial Court did not determine in its opinion

that Santana spoke English fluently, but rather concurred with

the motion judge's determination that he could speak "some

English." <u>Santana</u>, 477 Mass. at 616. Santana has not

substantiated his argument that the Supreme Judicial Court erred

by not discussing the testimony of the expert witness that found

Santana spoke a "beginner's level of English."  See Pet. Mem.
10.

Further, the court's citation to the fact that LaBarge and
Cueva provided Santana with Miranda warnings, both verbally and
in writing in Spanish, "communicat[ing] in unambiguous terms
that [his] statement[s] would not be confidential," supports the
determination that Santana "fully understood what was going on"
despite an earlier assurance of confidentiality.  Santana, 477
Mass. at 616, 618.  Santana confirmed that he understood each
warning, and the Supreme Judicial Court found "no suggestion in
this record that [Santana] did not understand the warnings,
which plainly informed the defendant that his statements could
not be held confidential."  Id. at 617-18.  Additionally, the
court cited to LaBarge's post-Miranda warnings to Santana, which
Cueva translated, that the police "would report the information
to 'the [prosecuting] attorney that is going to be against [him]
when [he] goes to court.'"  Id. at 618 (alterations in
original).  Based on this information, Santana has not
demonstrated by clear and convincing evidence that the Supreme
Judicial Court erred in its determinations regarding his
comprehension that his statements could be used in court.

The second alleged error, the determination that Santana's
request for the police to stop recording his interview
demonstrated that he understood his Miranda warnings, Pet. Mem.

[23]

11, was also ultimately not unreasonable.  Of this
determination, the Supreme Judicial Court briefly states in its
opinion:

> Moreover, as the Commonwealth points out,
> [Santana's] request to cease audio recording shortly
> after being provided his Miranda rights and his refusal
> to sign Trooper LaBarge's contemporaneous transcription
> at the conclusion of the interview because he "didn't
> know where he stood in the case," suggest that [Santana]
> understood the statement could be used against him.

Santana, 477 Mass. at 619; see also Suppl. Answer 252-53.[3]  In
its brief to the Supreme Judicial Court, the Commonwealth argued
Santana recognized that talking to the police could have
criminal consequences for him, but that he was concerned only
about creating a record that Garcia might discover because he
said that he was "not worried" about giving the police those
statements.  See Suppl. Answer 252-53.  The court thus followed
the Commonwealth's reasoning that Santana's statement that he
"didn't know where he stood in the case" related to Santana's
primary fear that his statement might be used as evidence
against Garcia.  Santana, 477 Mass. at 619; Suppl. Answer 252-
53.

---

[3] As contemplated by Local Rule 5.4(g)(1)(E), Cowen filed a
Supplemental Answer containing the Massachusetts court records
in hard copy only with the Court.  Per that same rule, the
Supplemental Record has not been scanned into the Electronic
Case Files system.

Although the transcript reveals that Santana's main concern was his safety from Garcia if Garcia were to discover that Santana spoke to law enforcement, see Police Tr. 22-28, the Supreme Judicial Court did not unreasonably infer that Santana also knew that his statements might be relayed to a court for use against him. See Santana, 477 Mass. at 619. While this is a somewhat strained inference, a federal court must be "'highly deferential' to state court decisions" when conducting a section 2254(d) analysis. Correa, 216 F. Supp. 3d at 197 (citing Woodford, 537 U.S. at 24). Santana has not shown with clear and convincing evidence that he was not in fact concerned with issues of confidentiality when he requested that the police terminate the recording and refused to sign the officers' report. For this reason, Santana has not sufficiently demonstrated this second alleged factual error.

Finally, Santana's third alleged error, that the Supreme Judicial Court wrongly determined that Santana spoke with the police "out of self-interest and the fear of retaliation from Garcia, but was not concerned with talking to the police," is also unpersuasive. Pet. Mem. 12. Here, as with Santana's first contention of error, it is helpful to examine the Supreme Judicial Court's statement in the full context of the opinion:

> Last, [Santana] was motivated by self-interest and the fear of repercussions from Garcia when he approached his probation officer offering to provide information

> about the murder. As the judge found, [Santana] was not
> concerned about providing information to the police, he
> was particularly concerned with retaliation from "that
> young [nineteen year old] guy, that little guy has about
> [four] deaths under his belt." [Santana] added, "that
> young guy has me, he has me, you know, he has me under
> a lot of pressure and terrified.

Santana, 477 Mass. at 619 (emphasis added). Placing the

statement in context, the court determined here that Santana's

fear of Garcia harming him was the only reason he sought to

speak with law enforcement. See id. This conclusion is

supported by the interview transcript. Police Tr. 22:166, 168,

26:197 (recording Santana stating: "I'm not worried for telling

him and the police what I got to say, understand?[] [T]he thing

is . . . the one up there, understand? [T]hat young nineteen-

year-old guy . . . he has me under a lot of pressure and

terrified" and "[t]ell [LaBarge] that it was me who had him come

over, it wasn't him who looked for me -- it was me who asked for

him to come over"). The court's conclusion that Santana was not

concerned about providing information to police thus appears

factually sound, and Santana has not provided clear and

convincing evidence to the contrary.

Therefore, Santana failed to carry his burden of showing

that the Supreme Judicial Court unreasonably determined the

facts when it deemed his statements to law enforcement

voluntary. See 28 U.S.C. § 2254(d)(2).

**B.    The Supreme Judicial Court's Decision Does Not Run Contrary to Federal Law and Does Not Constitute an Unreasonable Application of Federal Law**

Santana argues that the Supreme Judicial Court made two errors in its application of federal law.  Pet. Mem. 15-18.  First, Santana insists that both the Essex Superior Court and the Supreme Judicial Court erred when they gave significant weight to the fact that the interviewing officers provided Miranda warnings after they assured Santana that his statements would not be used against him.  Id. at 15-16 (citing Santana, 477 Mass. at 617).  Santana maintains that because the officers so assured him directly before administering the Miranda warnings, and because they did nothing beyond giving the Miranda warnings to indicate to Santana that this assurance was not valid, the Miranda warnings ought lack substantial weight in the voluntariness analysis.  Id.

Second, Santana argues that the Supreme Judicial Court failed to consider Cueva's assurances that he would tell the court of Santana's cooperation as part of the totality-of-the-circumstances analysis.  Id. at 16-17 (citing United States v. Rogers, 906 F.2d 189, 190-91 (5th Cir. 1990)).  While the Supreme Judicial Court emphasized that "an officer is not prohibited from suggesting broadly that it would be better for a suspect to tell the truth," Santana, 477 Mass. at 619 (internal citations and quotations omitted), Santana argues this analysis

considers the assurances "in a vacuum." Pet. Mem. 17. He insists that the Supreme Judicial Court unreasonably applied federal law by acknowledging that the totality-of-the-circumstances analysis applied in this case, but then determining voluntariness based substantially on the fact that the officer administered Miranda warnings. Id.

Santana suggests that the circumstances either render his waiver of his Miranda rights invalid or his entire statement involuntary under the Due Process Clause. Id. at 13 (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966); Jackson v. Denno, 378 U.S. 368, 376 (1964)). In Miranda, the Supreme Court determined that the Fifth Amendment privilege against self-incrimination requires law enforcement personnel to warn a person subjected to custodial interrogation of certain constitutional rights. 384 U.S. at 444. Specifically, before law enforcement questions a person, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. The individual undergoing interrogation may elect to waive his rights, but such waiver must be "made voluntarily, knowingly, and intelligently." Id.; United States v. Guzman, 603 F.3d 99, 106 (1st Cir. 2010). The individual

may, at any point, refuse to answer further questions and assert the rights he formerly waived.  _Miranda_, 436 U.S. at 444-45.

For a _Miranda_ waiver to be "voluntary," it must be "the product of free and deliberate choice," not "intimidation, coercion, or deception."  _United States_ v. _Bezanson-Perkins_, 390 F.3d 34, 39 (1st Cir. 2004) (quoting _Moran_ v. _Burbine_, 475 U.S. 412, 421 (1986)).  For an individual to waive in a "knowing and intelligent" manner, his waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  _Id._ (quoting _Moran_, 475 U.S. at 421).  Waiver, however, need not be express. _Guzman_, 603 F.3d at 106 (citing _North Carolina_ v. _Butler_, 441 U.S. 369, 373 (1979)).

Similar legal principles govern the Court's analysis of whether Santana voluntarily waived his Miranda rights and whether his statement itself was voluntary.  _See Bezanson-Perkins_, 390 F.3d at 39-40 (discussing _Miranda_ waiver); _United States_ v. _Hughes_, 640 F.3d 428, 438 (1st Cir. 2011) (examining voluntary statements).  Specifically, courts may consider factors such as the defendant's age, education level, intelligence, whether they were informed of their constitutional rights, detention duration, whether questioning was lengthy and repetitive, and any use of corporal punishment, but there is "no talismanic definition of 'voluntariness' mechanically

applicable to the host of situations where the question has arisen." Schneckloth v. Bustamonte, 412 U.S. 218, 224, 226 (1973).

Here, Santana's argument that the Supreme Judicial Court committed legal error when it determined his waiver was voluntary by apportioning excessive weight to the fact that police administered his Miranda rights after he was told the interview was confidential is ultimately unpersuasive. Pet. Mem. 15-16. His second argument that the court considered this statement "in [a] vacuum" rather than "as just part of the totality of circumstances analysis," see id. at 16-17, is also unpersuasive.[4]

Santana did not provide any controlling case law to support his assertion that the court placed too much weight on the Miranda warning.[5] Pet. Mem. 15-16. In fact, Santana cited to

---

[4] Santana appears to have admitted in his briefing that the officers informed him, after issuing the Miranda warning, that they might go to "the judge" with any information that he provided them during the interview. See Pet. Mem. 15-16; Police Tr. 21:159 (translating Cueva's Spanish-language statement that "[a]ny information that you give us now, [LaBarge would] go to the court and they'd talk with the judge and the lawyer and to say that 'look, [Santana] came, talked to me, gave me that and, we're going to try to help you, but he wouldn't give you er . . . er, you know -- [sic]"). This fact further indicates that Santana was aware that the interview was not confidential.

[5] Santana cites a Supreme Court footnote to suggest that the law enforcement officers' statements should invalidate his waiver of Miranda rights. See Pet. Mem. 14 (citing Colorado v. Spring, 479 U.S. 564, 576 n.8 (1987)) ("[T]he Court has found

[30]

<u>Schneckloth</u> in support of his proposition that a <u>Miranda</u> warning is one factor that a court may consider when evaluating voluntary waiver and that "[t]he totality of the circumstances test does not favor any one of these factors over the others -- it is a case-specific inquiry where the importance of any given factor can vary in each situation."  Pet. Mem. 14 (citing <u>Schneckloth</u>, 412 U.S. at 226-27).  Correct -- courts have a fair amount of discretion in conducting their totality-of-the-circumstances analysis.  <u>See</u> <u>id.</u>

---

affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege.").  The problem with Santana's citation is twofold.  First, Santana cites a footnote that contains dicta and is "not clearly established federal law" under 28 U.S.C. § 2254(d)(1).  <u>See</u> <u>Yarborough</u>, 541 U.S. at 660-61.  Second, the cases cited in support of the footnote, which Santana also cites in a parenthetical, involve extreme circumstances of misrepresentation that do not appear apropos to the case at bar:

> In certain circumstances, the Court has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege.  <u>See, e.g.</u>, <u>Lynumn</u> v. <u>Illinois</u>, 372 U.S. 528 (1963) (misrepresentation by police officers that a suspect would be deprived of state financial aid for her dependent child if she failed to cooperate with authorities rendered the subsequent confession involuntary); <u>Spano</u> v. <u>New York</u>, 360 U.S. 315 (1959) (misrepresentation by the suspect's friend that the friend would lose his job as a police officer if the suspect failed to cooperate rendered his statement involuntary).

<u>Spring</u>, 479 U.S. at 576 n.8.  Santana neglects to explain how the cited cases are analogous to the present action so as to indicate a violation under 28 U.S.C. § 2254(d)(1).  <u>See</u> Pet. Mem. 14-16.

Further, the Supreme Judicial Court did consider both the police's pre-Miranda confidentiality promise as well as Cueva's post-Miranda statement about speaking to the court if Santana provided information. Santana, 477 Mass. at 617-19. Despite Santana's assertion to the contrary, the court did contemplate Cueva's statement in conjunction with the police's pre-Miranda confidentiality promise and the Miranda warning. See id. at 618-19. After considering the totality of the circumstances, the court determined that Santana's waiver was voluntary. Id. at 620.

Here, Santana shows neither that the Supreme Judicial Court's allotment of weight to the Miranda warning nor its analysis of Cueva's statement was "contrary" to federal law. See 28 U.S.C. § 2254(d)(1). Santana has not demonstrated that the court's mode of analysis conflicts with Supreme Court case law or diverges in holding from a factually similar decision. See Gaskins, 640 F.3d at 451-52. Additionally, Santana has not established that the court unreasonably applied Supreme Court precedent "in an objectively unreasonable manner . . . devoid of record support for its conclusion." See Gaskins, 640 F.3d at 452 (internal citation and quotation marks omitted).

Therefore, this Court does not grant a writ of habeas corpus under 28 U.S.C. § 2254(d)(1).[6]

## III. CONCLUSION

For the foregoing reasons,[7] this Court DENIES Santana's petition for a writ of habeas corpus, ECF No. 1.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE

---

[6] While this Court holds that the Supreme Judicial Court was neither factually nor legally unreasonable when determining that Santana's statements were voluntary, the Court also agrees with the Supreme Judicial Court's sentiment that: "[t]his case makes plain the need for law enforcement to use capable, trained translators who will report verbatim the question asked and the response given." Santana, 477 Mass. at 618 n.6.

[7] In light of the analysis above, there is no need to address the issue of actual prejudice.